IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

STEVEN COLE,
   *Defendant*

Criminal Action No. ELH-18-167

**MEMORANDUM**

On May 18, 2020, Steven Cole, proceeding pro se, filed a motion titled "Pursuing Compassionate Release Relief Under 18 U.S.C. 3582(c)(1)(A)(i)." ECF 61. On June 2, 2020, counsel entered an appearance for Cole (ECF 64) and subsequently filed a supplemental memorandum in support of Cole's motion. ECF 66. I shall refer to ECF 61 and ECF 66 collectively as the "Motion." The Motion is supported by several exhibits. ECF 66-1 to ECF 66-9. The government opposes the Motion (ECF 73) and has also submitted several exhibits, including Cole's medical records from the Bureau of Prisons. ECF 73-1 to ECF 73-7. Cole filed a reply. ECF 77.

The government subsequently sought permission to file a surreply (ECF 80), to which the defense asserted limited objections. ECF 82. Subject to the defense's concerns, the Court granted leave to the government to file a surreply. *See* ECF 81; ECF 83. The Surreply is docketed at ECF 87.

The Court has also received correspondence in support of the defendant. ECF 90 to ECF 94. In addition, the government submitted correspondence on July 30, 2020, relating to a health condition of the defendant. ECF 95.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

## I. Background

On March 27, 2018, a grand jury sitting in the District of Maryland returned an indictment against Cole (ECF 1). He was charged with possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count One); possession of a firearm in furtherance of a drug trafficking crime, in violation of 21 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count Two); and possession of a firearm and ammunition by a felon, in violation of 21 U.S.C. § 922(g)(1) and 18 U.S.C. § 2 (Count Three). *Id.*

Pursuant to a Plea Agreement (ECF 27), Cole entered a plea of guilty on December 11, 2018, to Counts One and Two of the Indictment. ECF 25. The government agreed to recommend a reasonable sentence. ECF 27, ¶ 10.

The Plea Agreement included a factual stipulation. *See* ECF 25 at 10-11. According to the stipulation, Cole, then 31 years old, sold "opioid narcotics in the area of 2400 Winchester Street in Baltimore, less than a block away from the James Mosher Elementary School and across the street from a baseball field adjacent to the school. On his person, Cole carried a revolver-style handgun." *Id.* at 10. Baltimore City Police officers observed Cole selling narcotics to the driver of a vehicle. *Id.* Cole spotted the officers and fled into the stairwell of an apartment complex. *Id.* In Cole's discarded jacket, officers found a handgun with five rounds of ammunition. *Id.* Cole had "two past convictions for possession with intent to distribute controlled dangerous substances" and was thus prohibited from possessing a firearm. *Id.*

The officers searched Cole and "recovered a number of pills—2.99 grams' worth total—which ultimately tested positive for oxycodone." *Id.* They also recovered $443, which

represented proceeds from his sale of drugs. *Id.* On Cole's social media accounts, law enforcement found pictures of Cole wearing the discarded jacket, pictures of Cole handling large amounts of cash, pictures of OxyContin pills, pictures of handguns, and posts indicating his gang affiliation. *Id.* at 11.

According to the Presentence Report ("PSR," ECF 30), Cole qualified as a career offender under U.S.S.G. § 4B1.1. *Id.* ¶ 26. Therefore, his offense level increased to 32. *Id.* ¶ 27. After three deductions for acceptance of responsibility, the defendant had a final offense level of 29. *Id.* ¶ 30. As a result of the defendant's career offender status, his Criminal History Category increased from V to VI. *Id.* ¶¶ 40, 41. The defendant's advisory sentencing guidelines called for a period of incarceration ranging from 262 to 327 months. ECF 42 at 1.[1]

Sentencing was held on April 22, 2019. ECF 29; ECF 66-6 (Transcript). The government sought a sentence of ten years or 120 months. ECF 66-6 at 28. The Court observed, ECF 66-5 at 42: "This is a very serious case . . . ." Further, the Court said, *id.*: "[T]here is a certain brazenness about this offense, that in broad daylight, on a school day, less than a block from an elementary school, you were dealing, and you had a handgun . . . [C]hildren are at risk when people are dealing drugs near school on a school day and they have a gun with them."

Nevertheless, the Court found grounds for mitigation. *See* ECF 66-6. The Court sentenced Cole to 48 months of imprisonment as to Count One and 60 months incarceration as to Count Two, consecutive, for a total term of incarceration of 108 months, with credit from December 6, 2017. ECF 41 (Judgment). He was also sentenced to 5 years of supervised release. *Id.*

---

[1] If the defendant were not a career offender, the defendant would have had a final offense level of 13 for Count One. Count Two required a mandatory minimum sentence of five years, consecutive. *See* ECF 66-5 at 13. In that circumstance, the guidelines would have called for a total sentence ranging from 90 to 97 months of imprisonment. *Id.* at 14.

Cole, who is now 32 years of age, "has been jailed since his arrest in December of 2017." ECF 66 at 2. He is presently incarcerated at the Metropolitan Detention Center in Brooklyn, New York ("MDC Brooklyn"). ECF 66 at 1. According to the government, MDC Brooklyn is a "pretrial and holdover facility," at which the defendant has been held since February 11, 2020. ECF 73 at 6. He is scheduled to be transferred to FCI Allenwood Medium in Pennsylvania. *Id.* The defendant has a projected release date of October 27, 2025. ECF 66-3 at 1.

On April 27, 2020, Cole requested compassionate release from the Warden of MDC Brooklyn, due to asthma, high blood pressure, and "sickle cell trait." ECF 73-2; *see* ECF 66-1 at 10. The request was denied on April 30, 2020. ECF 73-3. Thereafter, on May 18, 2020, Cole moved for compassionate release from this Court. ECF 61; *see also* ECF 66. Cole's projected release date is October 27, 2025. ECF 73-4.

Additional facts are included, *infra*.

## II.   Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030

(1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying motion for compassionate release because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished. BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), Cole must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Sentencing Commission in U.S.S.G. § 1B1.13, *i.e.*, that the defendant does not pose a danger to the community. The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under § 3582. *See United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013).

### III.   COVID-19[2]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, ___ F. Supp. 3d ___, 2020 WL 2556496, at *1 (D. Md. May 20, 2020). That crisis is COVID-19.[3] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

---

[2] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *Antietam Battlefield*, 2020 WL at 2556496, at *1 n.1 (citation omitted).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the Court must underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  Moreover, although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted).

The COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, ___ F. Supp. 3d ___, 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). As of August 5, 2020, COVID-19 has infected over 4.7 million Americans and caused nearly 157,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed August 5, 2020).

The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, ___ Fed. App'x ___, 2020 WL 3100187 (6th Cir. June 11, 2020).  Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses have reopened, many are subject to substantial restrictions.  And, in view of the recent resurgence of the virus, businesses are again facing closure.

Unfortunately, there is currently no vaccine, cure, "or proven effective treatment" that is available. Moreover, according to the Centers for Disease Control and Prevention ("CDC"), certain risk factors increase the chance of severe illness. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, to reflect the most recently available data, the CDC revised its guidance as to medical conditions that pose a higher risk of severe illness from COVID-19. Then, on July 17, 2020, to reflect the most recently available data, the CDC again revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (July 17, 2020), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; and Type 2 diabetes. Obesity where the body mass index ("BMI") is 30 or higher is on the list, as is Type 2 diabetes.

The CDC has also created a second category for conditions that "might" present a risk for complications from COVID-19. The list of factors that might increase the risk includes cerebrovascular disease, hypertension, pregnancy, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, smoking, and Type I diabetes. *See id.* For example, moderate to severe asthma is an underlying medical condition that was moved to the new

category; it is now identified as a condition that "might" put an individual at higher risk for COVID-19 complications. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed May 21, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see also Cameron*, 2020 WL 2569868, at *1. They are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be

considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

Moreover, Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

The BOP has implemented substantial measures to protect prisoners from COVID-19 and to treat those who are infected. *See* ECF 73 at 4-6 (detailing measures that BOP has implemented to contain the virus). As of August 5, 2020, there are no reported inmate infections

at MDC Brooklyn, and only one staff infection. *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[4] As of August 3, 2020, the BOP reported that 2,325 inmates and 503 BOP staff currently tested positive for COVID-19; 8,256 inmates and 708 staff have recovered; and 105 inmates and one staff member have died from the virus. *See* https://www.bop.gov/coronavirus/ (last accessed August 3, 2020). *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1. But, FCI Allenwood Medium currently has no active cases among either inmates or staff. *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

### IV. Discussion

#### A.

Cole urges the Court to reduce his sentence to time served under 18 U.S.C. § 3582(c)(1)(A)(i), on the ground that he suffers from "asthma, high blood pressure, obesity, a genetic trait for sickle cell anemia, and major depressive disorder—all of which collectively place him at serious risk of becoming ill from COVID-19." ECF 66 at 1. He contends that these conditions are all recognized by the CDC as risk factors for COVID-19. *Id.* at 5-13.

Cole's obesity puts him at risk of complications from COVID-19. And, his asthma and hypertension might also put him at risk for complications.

Numerous courts have found that, in light of the COVID-19 pandemic, chronic medical conditions, including obesity and hypertension, qualify as a compelling reason for compassionate release. *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich.

---

[4] The *New York Times* has reported that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2.

May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g., United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason).

Indeed, the government concedes that, under the revised CDC guidance, "Defendant's body mass index (BMI) above 30 constitutes an extraordinary and compelling reason warranting a reduction [in] sentence." ECF 95. I am satisfied that, given Cole's obesity, coupled with his other medical conditions, he satisfies the "extraordinary and compelling" prong of the § 3582 analysis.

**B.**

Cole notes that he has a release plan, by which he will reside with his daughter and her grandmother. ECF 66 at 19. Cole would be the primary caretaker for his minor daughter, who is

currently being cared for by her grandmother. *Id.* If released, Cole also "intends to return to his son's life." *Id.* His son is now fourteen. *Id.* Further, he points out that his record is "devoid of violence." *Id.* at 20. However, he concedes that his record reflects multiple non-violent drug offenses." *Id.*

In addition, Cole asserts that his "grandmother is. . .very close to death." ECF 77 at 20. He claims that his desire to see her before she passes away "provides tremendous incentive for Mr. Cole to follow release conditions and adhere to all COVID-19 precautions so he can visit safely with her if released." *Id.*

Cole explains that his drug addiction stems from an incident when he was fifteen, in which he was shot and subsequently prescribed opiates for pain and developed addiction. *Id.* at 21. According to Cole, the best way to address these issues is through therapy and methadone-based programs. *Id.* And, he points to his positive record of education, employment, and contributions to his community. *Id.* at 22. In addition, Cole asserts that, upon his release, he will be employed as a janitor at BWI airport. *Id.* at 19. And, Cole observes that "he has already served a longer term in custody than he ever has before . . . ." *Id.* at 22.

Cole concedes that his prison disciplinary record is not "blemish-free." ECF 66 at 22. But, he characterizes the punishments he received as "minor." *Id.* n. 16.

## C.

The government contends that the factors under 18 U.S.C. § 3553(a) militate against granting Cole's Motion. ECF 73 at 32.

The government argues that Cole "is a career drug dealer who was caught in possession of opioid drugs and a firearm in the immediate vicinity of an elementary school and a baseball field," in an area in which he had previously been caught dealing drugs. *Id.* According to the

government, "none of Defendant's prior encounters with the criminal justice system—including his two past convictions for Possession with Intent to Distribute CDS (which rendered him a career offender)—were sufficient to deter Defendant to continue to break the law in the same manner and in roughly the same place as he did previously." *Id.*

Moreover, the government maintains that Cole received lenient sentences on his prior offenses, yet he failed "to take advantage of those 'breaks.'" *Id.* at 32. It also points out that defendant "has served *just one third* of his nine-year sentence—a sentence well below the bottom of [his] guidelines (262 months)—and asks this Court to give him another break.[]" *Id.* at 33 (emphasis added by government). In the government's view, "doing so would fail to promote respect for the law, provide just punishment, and afford adequate deterrence." *Id.* Further, it contends that Cole's disciplinary record "raise[s] serious questions as to whether he can be trusted to live a law-abiding life if released." *Id.* at 34.

Further, the government points to the findings of Judge Rachel P. Kovner of the U.S. District Court for the Eastern District of New York, in a case seeking the release of vulnerable inmates from MDC Brooklyn. The judge denied a motion for preliminary injunction "'that would release all MDC inmates whose age or medical condition places them at heightened risk from the virus and would manage almost every aspect of the facility's COVID-19 response.'" ECF 73 at 27 (quoting *Chun v. Edge*, No. 20 Civ. 159 (RPK)(RLM), 2020 WL 2055669, at *1 (E.D.N.Y. June 9, 2020)); *see also* ECF 89 at 1-2. Judge Kovner concluded that MDC Brooklyn had responded aggressively to the virus, noting that no inmate had died and only one inmate had been hospitalized with COVID-19. *Chun*, 2020 WL 3055669, at *1.

## C.

As indicated, the Court has determined that the defendant has established a compelling reason justifying his release. But, that does not end the inquiry. The Court must also consider whether the defendant's release would pose a danger to the community, as well as the factors under 18 U.S.C. § 3553(a). Upon consideration of these factors, I conclude that release is not warranted.

This case is a very serious drug case. Guns and drugs are a dangerous combination, especially near a school and on a school day. And, while incarcerated, defendant has not been free of infractions, as reflected in ECF 73-6 and ECF 73-7. Given defendant's prior criminal record, coupled with the defendant's infractions and the facts of this case, I cannot conclude that he is no longer a danger to the community. And, under 18 U.S.C. § 3553(a), the nature and circumstances of the offense, and the need to promote respect for the law as well as just punishment, militate against the Motion.

Moreover, Cole received a sentence for the instant offense that was significantly below the advisory guidelines range and well below the one sought by the government. And, he has only served one third of his lenient sentence.

Both MDC Brooklyn, where defendant is currently incarcerated, and FCI Allenwood Medium, to which he will be transferred, currently have either very low or no incidence of COVID-19. "While the Court does not consider the actual presence of COVID-19 within a prison to be a necessary prerequisite for a finding that an inmate with a high-risk medical condition should be released based on extraordinary and compelling reasons, the fact that there are no cases at [the facility] reduces the imminence of the risk to [defendant] and must be

15

considered." *United States v. Wright*, TDC-17-0388/TDC-19-0035, 2020 WL 2571198, at *3 (D. Md. May 21, 2020).

In sum, after applying the factors in 18 U.S.C. §§ 3142(g), 3582(c)(1)(A)(ii) and 3553(a), I shall deny the Motion.

### V.    Conclusion

For the forgoing reasons, I shall deny the Motion (ECF 61), without prejudice.

Date:   August 7, 2020                                        /s/
                                                   Ellen Lipton Hollander
                                                   United States District Judge